Yes, Ms. Maddox. May it please the Court, my name is Marie Maddox, counsel for the appellants. And the issues before the Court today are whether the trial court correctly granted summary judgment on a multitude of issues, one of which is whether Dr. King was speaking as an employee rather than as a citizen. How could she not have been speaking as an employee? That was her duty. That's what she was paid to do. Well, Your Honor, respectfully, even the county... And she was paid to do exactly what she did, which was voice her opinion about whether Mr. J. was ready to do the work and could do the work safely to his health, right? Well, Judge, if that was the only thing that she had reported, then I would agree with Your Honor. But that's not the only thing that she... Any report she says about whether he's fit or not fit is covered by Garcetti, right? It is. And the interference... What did she say that was not covered by Garcetti? There were two issues that she reported, and this is even, and it's covered in our brief on page 32 in the appellant's initial brief. The county manager, Mr. Freeman, had testified when I asked him in his deposition whether there were matters that were outside of her job duties. And he answered yes, that reporting reverse discrimination would not be part of Dr. King's normal job duties. And reporting public safety concerns would not be part. So the cases that we've relied on and cited in our briefs don't say that you have to be... Well, public safety concerns arising from what? Arising from having allowed J. to perform the job duties of a firefighter. When he was not physically fit or health fit to perform the duties. Yes. Of course that's part of her job duties. Of course it is. Whatever the guy said. And the county manager had said that reporting these public safety concerns was, he did not consider those as part of her ordinary job duties. Just wrong. Anything that requires her to report whether somebody is healthy and physically fit to perform the duties as a first responder, just inextricably is bound up with public safety. Yes, sir. He has a heart attack while he's trying to perform CPR on somebody. Come on. Well, she went beyond that though. And the court has to look individually at the statements that she made. So it wasn't just that she was reporting the public safety issues and the interference with her attempting to perform her job duties. But she also brought up on multiple occasions and meetings with both the assistant county manager, Ms. Thomas, with the county manager, Mr. Freeman, and then again with Mr. Hester, the deputy county manager, and sat and with Mr. Kushner, the risk manager. Pardon me. I'm trying to focus on what exactly, what you're addressing right now. I just want to be clear. Those are the statements that you say were First Amendment protected? These statements to Thomas and Freeman? Yes. Yes, Your Honor. And what she said. What she said in her meeting. She said she had one meeting with Thomas and one meeting with Freeman that you're focusing on. Is that right? I am. And then she had multiple meetings with Mr. Kushner and with Diane Maloney, who was the health director. And does your complaint lay out that those are the bases for the First Amendment claim? They do, Your Honor. It does. So it's Thomas and Freeman and Kushner? And Diane Maloney. And not only did we lay it out in the complaint, but we also laid it out in Dr. King's testimony and other testimony that we had offered in opposition to summary judgment, where she had said, and it's important not to look just at the entirety, but to look individually. And this Court has said repeatedly that you have to look at the individual statements, even if some of those are for purely personal reasons and that would be under the Lane case, in furtherance of ordinary responsibilities, not merely speech that concerns ordinary responsibilities. I wonder if it isn't true that, particularly with respect to Thomas and Freeman, the concern appears to be a proper allocation of duties. Not so much whether they're getting the answer right, although obviously the proper allocation of duties, in her view, will lead to better answers. But both the idea about being worried about reverse discrimination and the other concerns seem to be addressed to the proper ally, like, this is my job, somebody else is doing my job, I'm responsible for this, somebody else is doing it. If that's the primary focus of these communications, then you have difficulty with your First Amendment claim. Is that true? It is true. If that was the primary, and that was part of the focus. That's kind of how the District Court read it, right? And that is correct. So what's wrong about reading? How is it inaccurate to read the descriptions, I mean the communications, as described in the record as being the way the District Court read them? Because she had, that was, it was only part of what she was reporting. And that's where, I think the rubber meets... So other things were being reported that... That were not, that didn't have to do with who has the responsibility in this office or in this organization? That was part of it, yes sir. What was it in there, not that any minuscule part is enough, but what was it in there that was not read properly as a concern about her duties within the organization? That she was reporting that Jay had been treated significantly more favorably than other white officers who are white firefighters, potential firefighters, who were unable to pass the pulmonary functions or other parts of the medical certification. And that because of the fact that you had more favorable treatment of Jay, that it could expose the county to liability, and what about all of these other white folks that had... It seemed to be primarily, I mean that's, I think that's how the District Court read the record. It's primarily that this is something that the county is going to worry about if they're going to do stuff like this, so they should change their procedures. That sounds like not acting like a public interested person, but like a person who's part of an organization who wants the organization to work properly. And that's kind of the line that we're drawing, right? Well, I would go back to Lane and look at what the court said in Lane, and then in Judge Martin's dissent in the Alves case, and Corallo case, and also just recently this court in the Fernandez. I think it was cited by the defendant as Ramirez, but it's . . . Alves, I don't know how you pronounce these cases, but Alves and the one that you just sent us . . . Corallo. They go against you though, right? I mean they don't really . . . I mean you can distinguish them, but they can't be really cited as support for your position. Respectfully, Judge Rogers, I would disagree, and I would think that they . . . I don't understand that. Because . . . Usually when you argue in favor of some result, you argue cases that came to the same result and say that this is that case. Well, if I'm not . . . Go ahead. Corallo is in our favor. Alves, Judge Martin's dissent . . . Wait a minute. I'm not going to travel very far on this, I'm afraid. Okay. But I can tell you that in looking at what she had reported, she reported that there was interference with her job by Baker Buford. She reported that there were . . . That's consistent with the idea that we're worried about job . . . And I'm . . . Right? Well, she was worried, yes, that's part of her job. Right. But then a large part of what she was also reporting, and she had reported it consistently in every meeting that she had had with the management within the county. And she had reported every single time and went to the risk manager. And they had been told, the risk manager, that one of the problems that she was having with this is that Jay had been treated more favorably than the white applicants or firefighter. And so if you look at the individual statements that she was making and the number of times that she made it. And it doesn't matter whether, according to the case law from this court, it doesn't make a big difference that she didn't make these publicly, that she made them just to the county management and to the risk manager. Although that cuts against you. It . . . It's not something we ignore. You don't ignore it. No, you don't ignore it. And to the extent we do look at it, it doesn't help you. Is that correct? Well, the Rodin case and there are other cases from the 11th Circuit that say that private doesn't matter if there was a public-minded purpose. And so you would still look to see if there was a public-minded purpose behind what Dr. King was reporting. And our position is that if you look at the number of times that she brought this issue up, the reverse discrimination up, that it wasn't just a small part of what she was reporting, but she was in the context of her reporting and saying that she's been interfered with. Why did we not treat white applicants exactly the same way? And that this could expose the city to liability. And then . . . Ms. Maddox, if you've dealt with that question, I wanted to give you a chance to respond to what worries me about your case. Okay. I read the district court's order to say even if we accept this as public speech and even if Dr. King prevails on the balancing test, she failed to present evidence of causation. And I didn't see where you addressed that in your brief. Can you point me to where you responded to that? Yes, ma'am. I would have to go back to the brief. Well, you'll have a chance when you get back up. All right. We had addressed the issue that she had been . . . There was an ordinance that was passed back in 2006, and under that ordinance it said that health care services or something along the lines of services had to be put out for bid if it was greater than $50,000. Well, Dr. King's contract was only $36,000, so it would never have fallen under the ordinance anyway. The 2013, and I think what you may be referring to, was the 2013 email that we moved for reconsideration on to allow newly discovered evidence to be presented. But even without that, to look at the circumstances and to look at the comments that were made . . . I see that my time has expired. May I continue? Yes. To look at the circumstances to see that even after the 2006 ordinance had been passed, that there were three times that Dr. King's contract had been renewed. You have that. You have comments that were made by Commissioner Smith to her that was on the commission, and he said to her that the reason she was not renewed essentially was because of her interactions with Jay and what happened with Jay. You have Michael Kushner that's telling her that the reason that she's not . . . the risk manager apologizing to her and saying that the reason that you're not being renewed is because of Jay. You have the selection committee. They don't even start to do anything, even if you've got the 2013 email. They don't even start to do anything to further this issue of putting it out for bid until 2015 after Dr. King has made her reported disclosures. The brief is long, so I'm assuming all those facts are in there, but just so you have the full understanding of what I'm thinking about your case is that . . . and once was in the statement of issues, and then once in the reply brief. If I'm missing it, I'd love for you to tell me how. I will certainly do that when I get back. Thank you. Okay, thank you. All right, Mr. Trone. Good morning. Please record. I'm John Trone from Lakeland. I represent the Appalachian case, and I ask that you affirm the district judge's decision here. I'm sorry, Your Honor. I will start with some of the issues that you've been addressing. First, speaking as an employee versus a citizen, and I would wholeheartedly agree with the comments because if you look at some of the most compelling evidence in the case, it all circles back to Dr. King getting her job done as she perceived it. She was completely immersed in the process to the point that she contacted Jay's pulmonologist and asked him to rescind his clearance to the point that she notified Jay's pulmonologist that from now on she would be the sole and only contact from Polk County. She did a public records request from her own employer. She sought the phone records from a consulting doctor, all with the idea of proving that there was this interference in her doing her job. And so I think why isn't it simultaneously an effort to make sure that somebody who is not capable of doing a good job as a fireman or an EMT doesn't get the job? You could be trying to achieve both at the same time, couldn't you? Well, if I understand the question, Your Honor, I think what the court found was that her primary efforts here— So it's a primary thing. It's just like which is more, but you agree that you could conceivably, hypothetically, you could have somebody who says this is a bad result for the public and the reason it's coming about is because you're fooling around with my duties. Exactly. That could both be at the same time, right? What is the law when they're both at the same time? Can you express one of them even though it has the effect of helping you with the other one? Well, I think the law is that obviously in all of these cases there's a lot of things that are intertwined. Judges are looking for primary purpose, main thrust. You've got to look at the main thrust? Is that what the law is? Well, that's on public concern. When you're speaking about Garcetti and whether the job duties are within their ordinary job duties, my point is, and I was looking at it in this term, I'll give you an example. All of this circles back to what she does. If you don't do what I say and allow me to be the final say on these things, you may have a problem with reverse discrimination. If you don't do what I say and allow me to be the final say on this, you may have a problem with safety. So the answer to my question is you can have both, but if it's expressed in terms of the one rather than the other, then that's the one that's operative. Is that the idea? Do you have cases that support that? Yes, sir, and I think the Alvis case with the staff psychologists who were saying, complaining they couldn't get their job done due to the incompetence of their supervisor, and that was not found. Were there public purposes that were lurking there as well? In that case? Yes, because in that case they were complaining. Part of what they were complaining about was racial discrimination. They were saying that this person doesn't treat people of color fairly. They were saying that this person is inhibiting their ability to give care to some students in crisis. So there were some of that public concerns. Maybe you should have argued that case. Well, the way I looked at it, and I tried to think of an analogy on the case, if she were looking at a different department, if she was saying, look over there, I noticed the meter readers in the traffic department are only giving tickets to black people and not white people, completely unrelated to her job duties, that's one thing. But when she brings it back to what she does and says, you may have a problem with reverse discrimination if you don't follow what I'm telling you you need to do, or you may have safety concerns if you don't let me have the final say, that's how it circles back to her own duties. You're talking now about this case rather than the Alvis case? I'm sorry? You're talking now about this case rather than the Alvis case? This case, yes. Okay, go ahead. But Alvis by analogy, and I'll talk about causation since that was brought up. It looks like . . . I mean, did you respond to a causation argument in your red brief? I don't think you did because I don't think one was made, but . . . Really, it was brought up in terms of the motion for reconsideration. I noticed that, too, because she submitted a number of briefs after the judgment was entered. And so it was, in fact, it was in here today. I wanted to make sure that you all understand this causation issue is being looked at in terms of the motion for reconsideration. So that's an abuse of discretion standard. On that . . . I mean, we have to just . . . I mean, we can only address the issues that were raised in this court. Right, yeah. Boy, now I'm confused. You're talking about what was raised below, and Judge Martin's talking about what was raised here. Is that correct? Yes, I think . . . So how do you respond to Judge Martin's question about what was raised here? Well, honestly, I don't know if she raised it in her brief. I know she raised it in the motion for reconsideration. In the district court? In the district court. She argues the motion for reconsideration in her blue brief, and then in her footnote one on page one of the reply brief, she seems to say that the sole argument is for reversal for the trial court denial of reconsideration. I don't really understand it. I know she devoted a lot of time to it in the reply brief, but I'll point out a couple of things about that. As I point out, that should be decided on an abusive discretion standard. The issue that they were addressing in those affidavits was something that was discussed thoroughly with witnesses and depositions. It was attached as an exhibit, that email. I think that was part of the basis for the judge's decision that all of that was available. The standard that they would like to propose for reconsideration is something novel as well. Even using their standard and using 6D as a method instead of the case law that has developed, there was no motion. There was no affidavit. There was no evidence below as to excusable neglect or why these things weren't addressed earlier. I'm not sure if the appellant is putting that burden on the trial judge. It's just divine, but none of that happened. Also, I'll point out that none of the things that were argued in any way contradicts the proof below from Mr. Craig that they had decided to put all medical directors out for bid back in 2013. In fact, another medical director, the one in charge of EMS, went out for bid in 2014. That's what I'm talking about, that the district court found, well, this decision to submit all these contracts to the RFP process was made before Dr. King ever spoke up about Mr. J. There wasn't any causal connection between what happened to her and . . . There wasn't anything that they put to contradict the evidence that we went forward with on our motion for summary judgment. In other words, the only . . . You're going back to what was in the district court. You won there because the district court . . . Among other things, the district court found that the RFP, requiring Dr. King to submit to this RFP process, was not related at all to her speech related to J because that requirement was imposed before she ever engaged in that speech. Yes, Your Honor. I did come forward with that affidavit from the county attorney, Mr. Craig. I know. You're talking about district court. Yes. I'm talking about what's here. Okay. I'm sorry. I'm . . . No, I just . . . I didn't think your briefs talked about it. I want to finish with reconsideration because this court has held in the Arthur v. King case that affidavits aren't considered new or newly considered evidence just because they were drafted new. The Mays case . . . All that affidavit came out in discovery, didn't it? Deposition, that sort of thing? Yes. All those subjects were thoroughly discussed in deposition. The Mays case that the district judge cited is still controlling. In fact, there have been a couple of cases that have come out recently. one last month out of this district that adheres to Mays, American Family Life Assurance v. Hubbard. I'll speak about a couple of other things. I want to definitely mention the public concern and the qualified immunity before I sit down. The public concern aspect, the court . . . Again, you're looking at finding the main thrust of things and speech is rarely, as it's been held, rarely all private or all public and you have to determine the primary purpose and this is a question of law for the court. The court found, based on the evidence and applying the Alvis case primarily, but I also want to point out that a very recent case has come out, Ramirez, that follows Alvis and also discusses the Lane case and its scope and breadth. I also want to mention that Judge Covington did have the benefit of Lane, did discuss that in her order. A couple of the cases that were cited by the appellant I think are distinguishable. The Phillips v. City of Dawsonville case, I just did not find any relevance to what's being decided. The facts on this issue that were important to the court, and again the court is required to examine the entire record and determine main thrust and what's primary and things of that nature, and what she found was a lot of speech about that she had never been challenged before, that Dr. King had never been challenged before, a journal which mentioned a lot of the issues about management and who should have the final say, but nothing about reverse discrimination. Her own complaints of unprecedented interference by HR, one of the individual defendants, Ms. Baker Buford, had emailed her and said we have to treat people equally and that was taken as some sort of interference. As I mentioned before, she was involved with the doctor himself in asking him to rescind his opinion and advising that she would have the final say from now on, that she would be the final point of contact. Qualified immunity in the remaining time was granted as well on behalf of the individual defendants. The Paul E. B. White case from the U.S. Supreme Court came out and set an issue to rest that general things that are generally similar are not enough. It's not enough to say that you can't fire someone for First Amendment reasons. There has to be some very similar cases. This court has found that that's very difficult to do in First Amendment cases, particularly when you have the Pickering balancing test on top of that. Our district judge set out to find some cases where a person was actively involved in trying to deprive another person of employment, where perhaps a reverse discrimination was involved and also intermingled with her own private employment issues about her own authority and could find none. She granted qualified immunity to all of the individual defendants, and I would ask that that decision be affirmed as well. I've got a few seconds left if you have any questions. We don't. Thank you, Counsel. Thank you, Your Honor. Ms. Maddox. You had asked whether we'd address the causation issue, and we addressed it in the context of Argument 1 in both the initial brief and the reply brief on the issue of the reconsideration. Your reconsideration argument, I just have to tell you, is very weak because what you rely on on reconsideration, you could have put before the district court in the original motion, summary judgment opposition there. The question is what standard was used, whether it's May or whether May is the court . . . I think the court held there that was it available. Was the evidence available versus . . . Of course it was available, but it all went up in discovery. Without a doubt, some of the issues came up, but whether they knew, both Maloney and Kushner, Mike Kushner, knew about this issue, that was what we did not know until after the order, the trial court's order had been entered. How did you find out afterwards that you would not have found out before? That Nancy King was having . . . She did not because Mike Kushner and Diane Maloney are not even copied on the latter part of these emails. He had been part of . . . Why didn't you find that out before instead of afterwards? Because she did not, and we did not, have any knowledge that they would have known. How did you get the knowledge that they would have known after the court ruled against you on summary judgment? As Dr. King had set forth in her affidavit in support of the motion for reconsideration, she was having lunch with the two of them after the court's order was entered. After she mentioned what the court had ruled, they then brought up . . . I think that this is all borne out. I'm trying to paraphrase what she said. They said, oh, well, that would be incorrect because of this. Then they had remembered conversations that they had . . . How did you depose them? We did. You didn't ask them about that? That was not . . . We did not appreciate that that . . . Yes, but your failure of appreciation is not a basis for reconsideration. Well, we didn't know that they knew the issues. Yes, but you knew you could ask them. That's what deposition . . . I don't even . . . Your Honor, respectfully . . . You can't have a motion on final disposition of a case and then say, well, let's go back and see if we can find some better evidence to put before the judge. It just doesn't work. Your Honor, respectfully, that's not what happened here, and that's not what . . . Because you deposed these two witnesses, you did not ask them that. That is, according to you, highly relevant. Well . . . Enough relevance to it that it justifies setting aside the order of the district court, which after the district court had focused and considered all your evidence and ruled, you say, wait a minute, let's start over. Put that aside because we found this highly relevant evidence that we didn't even ask about when we were deposing. Judge, I don't think that that evidence even . . . The evidence from Mr. . . . and what we had argued below and what we have even brought up here, and this is on pages thirty-four through forty-seven of our initial brief and starting on page one of our reply brief, where we have addressed this issue in saying even without the reconsideration that there were enough facts to show, and that's what we brought . . . That's a different issue than whether the district court erred by failing to grant your motion for reconsideration. Let me tell you something else that's very confusing to me. You file your notice of appeal both on the summary judgment and also the denial of the motion for reconsideration. Entirely proper to do that. But then, and in your brief statement of issues, you list, I think it's the first four issues, go to the merits of the summary judgment order, and then there's a motion for reconsideration issue listed, which is entirely proper. But then when you get to the brief, looking at page little i, you've got one argument, and it is the district court erred by denying appellant's motion for reconsideration, and everything is a sub-argument under that. And then when I read your brief from forty-nine to eighty, a lot of it's about the motion for reconsideration. It doesn't even appear that if you fail the motion for reconsideration, you've preserved the district court's underlying summary judgment motion. And I'll tell you what really confuses me is that footnote one of your reply brief. You say appellees are correct in footnote two, that after earlier properly stating the standards applicable to review a summary judgment reconsideration, which you did in your standard review, appellants misspoke within the arguments and authorities section of the initial brief in describing their sole argument. Which should have been on the reconsideration. No, their sole argument that for reversal of trial court denial of consideration as a de novo appeal. You refer to your argument about the motion to reverse the denial of consideration as your sole argument. Yes, sir, but that was a misstatement by us because it wasn't our sole argument. Our argument was, and obviously we raised other issues other than reconsideration on our subsequent arguments in the brief. And that was a misstatement as to whether it was de novo versus an abuse of discretion. I'm for treating that as so, but there are parts of the sub-arguments which seem to speak to the summary judgment, which talk about because it was a motion for reconsideration. And discuss it like that. What I'm just saying, and I'm going to treat it as though you properly distinguished and that was on the summary judgment motion. But you need to be a lot more careful in the organization of the brief. Because one of the first things I do when I get a brief is look at the table of contents. Because that's the mouth of your argument. I understand what you're arguing and where you're arguing it and that kind of thing. And it was just real confusing. Having said that, I've taken up at least two minutes of your time. So we're going to give you two more minutes. Can I ask a follow-up question to that? In light of that, I'm just trying to get exactly where you argue the matter that Judge Martin raised. The district court relied in the alternative on a causation issue to rule against you. So you need to dispose of that in your brief. Where exactly in your brief is that? I think you answered it, but I didn't quite get it. Can you just give me the pages? Yes, sir. We argued it in the facts on pages. I'm talking about in the argument. The facts are long, very long. Yes, sir. You can put anything in the facts. That doesn't mean you've raised an argument. Where in your argument is that? In the facts, there were pages 34 through 47. And then on the causation issue in the reply brief, what we said on page— The main brief. Because you would have to bring that in the main brief, right? Yes, sir. So you're saying it's not raised between page 49 and 80? It is raised as part of the reconsideration in the initial brief, and it is— Where is that? I'm just asking where that is, is all I'm asking. It's raised just in the reconsideration. Take some time to show us in the brief because we both look for it unsuccessfully. It's not independently—what I'm trying to say is it's not independently raised as a causation issue independent of the reconsideration argument. Show us where in connection with the reconsideration argument it's raised. That's my question. Oh, I'm sorry. Which may not be enough to preserve it, but at least we would like to see what you said. So I see it set out on page 1 as a— I mean, it's listed as argument number 3, if I recall correctly, and then— 2. 2, sorry. And then on page 48, you say, quote, whether the district court erred by finding that— Speaking of Dr. King, she appropriately demonstrated that both the initial and subsequent termination of the RFP process were causally related to her speech, end quote. That's a stronger argument. Yeah, that's right. I don't see it anywhere else, but maybe I'm— Then we argued again that under the excusable neglect standard, and that's where we had argued in— Just pages is all. Make your time. Just give me just a second. Two cases today. You're lucky. Thank you. We argued on page 61. I'm sorry, it's the record at 61. It's page 50 of our initial brief. Page 50 of your initial brief or page 61, our book? 61 of 92, or it's actually page 50, the actual page, and it says where we're arguing about the reconsideration appellee has not credibly disputed that such evidence establishes a material issue as to causation, nor did the trial court ever question the conclusion. You raised it there, but the only time you raised it in your blue brief was on the denial of the motion for reconsideration because the district court didn't consider some evidence you put before it for the first time in that motion for reconsideration. Yes, sir, and then we raised it again a second time in the reply brief and said even without this evidence, the court should not have granted summary judgment even without the newly discovered evidence. The difficulty is that if we decide the district court didn't abuse its discretion in denying your motion for reconsideration because you could have put the evidence before it earlier, before it ruled on summary judgment, then there's nowhere in your brief that you raised the issue of causation. There's nowhere left if we affirm the district court's denial of your motion for reconsideration. Well, I think that we have raised, if I could go through, and it may be that we have not, Your Honor, to be candid with the court, we have not raised it as a separate heading. It is throughout the brief, it is an issue that we have addressed, but did we raise it as a separate issue? No, Your Honor, we did not, and we did not raise it as a separate issue in the reply brief, but we raised it and said in the reply brief that even without this evidence, then there was sufficient evidence to have denied summary judgment on causation. Ms. Maxwell, I wish I had stayed in Atlanta, but do you dispute that the RFP process was started in 2013 and that that was before Dr. King spoke out about it? We dispute that. You dispute that? Yes. Well, and that's in your brief as well? It is. In the blue brief. We've gone through, and this is on pages 34 through 47 in the facts. We dispute that. Okay. And the reason that we dispute it is because there was no effort, even though she was two years into the contract or almost three years into the contract, there were no efforts to try to do anything to further this RFP process, plus the RFP did not even apply because she was under the $50,000 threshold. $50,000 is what was required. She was at $36,000, so there would never have been an RFP that would be required. And that's based on evidence that was before the district court when it ruled on the motion for summary judgment as distinguished from later submitted evidence on the motion for reconsideration. Absolutely. Everything that I've argued on pages 34 through 47 was all before the district court. Okay. Thank you. We have the case. We'll take it under submission and recess until tomorrow morning.